**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

GENERAL MOTORS CORPORATION,

    Plaintiff,

v.

HOT CARTS, INCORPORATED, ULTRA GOLF
CARS, INC., ELECTRIC CAR DISTRIBUTORS,
INC., CHUCK BERRY, ALISHA MILLER, TONY
TORRES, ANDREW W. COUCH, AND VARIOUS
JOHN DOES AND JANE DOES,

    Defendants.

_____/

Case No. 04-CV-72939-DT

HONORABLE DENISE PAGE HOOD

**MEMORANDUM OPINION AND ORDER**

**I.   BACKGROUND**

On August 3, 2004, Plaintiff General Motors Corporation ("GM") filed the instant suit against Defendants Hot Carts, Inc. ("Hot Carts"), Ultra Golf Cars, Inc. ("Ultra"), Electric Car Distributors, Inc. ("Electric"), Chuck Berry, Alisha Miller, Tony Torres, Andrew W. Couch, and various John and Jane Does, alleging: trademark and trade dress dilution under 15 U.S.C. § 1125(c) (Count I); trademark infringement and counterfeiting under 15 U.S.C. § 1114 (Count II); false designation of origin or sponsorship, false advertising, and trade dress infringement under 15 U.S.C. § 1125(a) (Count III); and, contempt of court for violation of injunction and breach of settlement agreement infringement (Count IV). Plaintiff also filed a Motion for Preliminary Injunction. Responses to the motion and a reply were filed and a hearing held on the matter.

Since 1981, GM and its predecessors in interest, have used the HUMMER® trademark, the HUMMER GRILL® trademark, and the HUMMER trade dress (including the distinctive and non-

functional shape of the HUMMER vehicles), developed and owned by GM, in connection with the sale, distribution, maintenance, service, and repair of HUMMER products and services. GM acquired all rights to the trademarks and trade dress for the HUMMER vehicles, and the associated goodwill. (Verified Complaint, ¶ 15) The HUMMER® H1 is the civilian version of the United States Army's Humvee. (Verified Complaint, ¶ 16) GM recently launched the new HUMMER® H2®, a newer generation and modernized HUMMER. (Verified Complaint, ¶ 17) Both the HUMMER® H1 and HUMMER® H2® bear a distinctive nose and grill. (Verified Complaint, ¶ 18) GM owns a trademark registration, U.S. Registration No. 1,959,544, for the distinctive shape and non-functional design of the nose of HUMMER vehicles, the HUMMER GRILL®. (Verified Complaint, ¶ 18) GM also owns a trademark registration for the H2 LOGO®, U.S. Registration No. 2,696,663. (Verified Complaint, ¶ 20)

GM also owns trademark registrations for the CADILLAC CREST® and the trademark registrations for the trademark ESCALADE®. (Verified Complaint, ¶¶ 21, 22) GM claims the Cadillac ESCALADE has a distinctive body style, shape and grill. (Verified Complaint, ¶¶ 23, 24)

GM claims the various HUMMER and CADILLAC trademarks are valid, unrevoked, subsisting, and incontestible, and constitute *prima facie* evidence of GM's exclusive ownership of the trademarks, collectively, the GM marks. GM claims it has extensively employed and caused to be advertised and publicized throughout the world, the GM marks and the distinctive design and shape of the HUMMER and ESCALADE vehicles. GM has spent hundreds of millions of dollars and has established considerable good will in the GM marks. GM and its authorized dealers and licensees are the only parties authorized to use the GM marks.

GM claims Defendant Ultra manufactured, advertised, and sold "Humdinger" golf carts,

without consent of GM, misappropriating the GM marks and trade dress. GM claims that the Humdinger golf carts infringed and diluted GM's HUMMER trademarks. On February 28, 2003, in a prior case before the Court, GM and Ultra consented to a Final Judgment and Permanent Injunction enjoining Ultra, and its owners, shareholders, officers, directors, employees and successors and all persons in active concert or participation with Ultra or any of them from using GM's HUMMER trademark and trade dress and shape. (Case No. 02-CV-73853-DT, *General Motors Corp. v. Ultra Golf Carts, Inc.*) GM claims that after the Permanent Injunction was entered, Defendants conspired to violate the Permanent Injunction and breach the Settlement Agreement by manufacturing, advertising, and selling the golf carts with GM's trademarks and trade dress, through another corporate entity, Defendant Hot Carts. GM claims Defendants now advertise the golf carts at the website HOTCARTS.COM. GM alleges that Defendants' new X4 Logo on its carts mimics GM's H2 Logo. In addition, GM claims Defendants use the exact same website Defendants used during the prior lawsuit, ULTRAGOLFCARTS.COM on Defendants' new website at HOTCARTS.COM, except Defendants have removed the reference to "humdinger" and replaced the word "Humdinger" with the word "X4."

GM also claims that Defendants manufacture, advertise, and sell golf carts that knock off the CADILLAC ESCALADE vehicle and violate GM's trademark and trade dress rights in the trademark ESCALADE, the CADILLAC CREST, the ESCALADE GRILL, and the distinctive shape of the ESCALADE vehicle. The golf carts are advertised at both HOTCARTS.COM and ULTRAGOLFCARTS.COM.

GM claims Defendants are not affiliated with, authorized, or sponsored by GM and have no authority to use the GM marks to identify Defendants' products, services, or goods. GM claims that

3

Defendants' wrongful use of the GM marks or confusingly similar versions of the marks, dilutes, tarnishes, and whittles away the distinctiveness of the GM marks.

**II.    ANALYSIS**

    **A.    Fed. R. Civ.P. Rule 65(a)**

        **1.    Standard**

GM seeks a preliminary injunction enjoining Defendants from manufacturing, advertising, and selling of golf carts that misappropriate the GM marks.

Four factors must be balanced and considered before the Court may issue a preliminary injunction pursuant to Fed. R. Civ. P. 65(a): 1) the likelihood of the plaintiff's success on the merits; 2) whether plaintiff will suffer irreparable injury without the injunction; 3) the harm to others which will occur if the injunction is granted; and 4) whether the injunction would serve the public interest. *In re Delorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985); *In re Eagle-Pitcher Industries, Inc.*, 963 F.2d 855, 858 (6th Cir. 1992); *N.A.A.C.P. v. City of Mansfield, Ohio*, 866 F.2d 162, 166 (6th Cir. 1989).

        **2.    Success on the Merits**

            **a.    Parties' arguments**

As to the first factor, likelihood of success on the merits, GM claims it is entitled to a preliminary injunction prohibiting Defendants from using the GM trademarks and trade dress. GM claims trademark and trade dress dilution under Section 43(c) of the Lanham Act, trademark infringement under Section 32(l) of the Lanham Act, false designation of origin or sponsorship and trade dress infringement under Section 43(a) of the Lanham Act, and common law trademarks infringement. GM claims it has protectable trade dress rights in the distinctive shapes of its vehicles,

citing *Ferrari S.P.A. Esercizio v. Roberts,* 944 F.2d 1235, 1250 (6th Cir. 1991)("[T]he unique exterior design and shape of the Ferrari vehicles are their 'mark' or 'trade dress' which distinguish the vehicles' exterior shapes not simply as distinctively attractive designs, but as Ferrari creations"); *Ferrari S.p.A. Esercizio Fabbriche Automobilie Corse v. McBurnie,* 11 U.S.P.Q.2d 1843, 1989 WL 298658 (S.D. Cal. 1989)(Plaintiff was entitled to a permanent injunction from manufacturing and selling Daytona replicas, which dilute the value of plaintiff's DAYTONA SPYDER trade dress); *Rolls Royce Motors Limited v. Custom Cloud Motors, Inc.,* 190 U.S.P.Q. 80 (BNA) at 2-4 (S.D. N.Y. 1976)(granting preliminary injunction against kit car manufacturer's copying of distinctive and non-functional body shape and grill of Rolls Royce automobiles); *Liquid Glass Enterprises, Inc., v. Dr. Ing. H.c.F. Porsche AG and Porsche Cars North America, Inc.,* 8 F.Supp.2d 398, 402 (D. N.J. 1998)(Porsche has protectable trade dress rights in its automobiles); *Chrysler Corp. v. Silva,* 118 F.3d 56, 58-59 (1st Cir. 1997)(trade dress of Dodge Viper protectable). GM claims that it recently obtained a preliminary injunction in a virtually identical case where a defendant was enjoined from manufacturing, advertising and selling kit cars or replicas of HUMMER vehicles, citing *General Motors Corp. v. Let's Make A Deal,* 223 F.Supp.2d 1183 (D. Nev. 2002).

In response, Defendants claim that GM has not demonstrated a strong likelihood of success on the merits because its arguments are largely an assertion of the "trade dress" of its HUMMER vehicles and are inapplicable to the instant case. The cases cited by GM involve "car kits," replicas and photographs that indisputably were intentional duplications of a vehicle. Defendants argue that this case does not involve a "knock off" of the HUMMER. Defendants claim the evidence of intentional copying of a vehicle's design is absent in this case. To the contrary, Defendants assert the X4 was specifically intended not to copy the HUMMER. Defendants argue that GM does not

specify what, if any, similarities supposedly exist between the HUMMER and the X4. Defendants argue it is clear that the "X4" cannot be confused with the "H2." If GM's argument were correct, then GM could have a monopoly on any letter/number combination which is commonly used by various automakers. A side by side comparison of a HUMMER vehicle and an X4 golf cart, offered in GM's papers, reveals no resemblance whatsoever between the vehicles, other than the color yellow. Defendants submitted declarations of Defendants Miller and Berry which assert that the HUMMER vehicles and the newly redesigned golf carts are not "too similar" to GM's HUMMER vehicles. (See Berry Decl., ¶¶ 7-8; Miller Decl., ¶¶ 7-9)

### b.     Trademark Infringement

There are two issues under the Lanham Act before the Court. The first is whether GM's registered "marks" have been infringed and the second is whether GM's trade "dress" has been infringed. GM's motion lumps these two arguments together.

The Lanham Act provides that a party must first register the mark at issue. 15 U.S.C. § 1114 and § 1125(a). The Sixth Circuit has set forth the following factors to determine likelihood of confusion under the Lanham Act: 1) strength of plaintiff's mark; 2) relatedness of the goods; 3) similarity of the marks; 4) evidence of actual confusion; 5) marketing channels used; 6) degree of purchaser care; 7) defendant's intent in selecting the mark; and 8) the likelihood of expansion in selecting the mark. *Frisch's Restaurants, Inc. v. Elby's Big Boy,* 670 F.2d 642, 648 (6th Cir. 1982); *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir. 1988). GM did not address these factors in its briefs. For purposes of this motion only, the Court makes the findings below.

Defendants do not dispute that GM's marks are strong. This factor weighs in GM's favor.

Regarding the relatedness of the goods, Defendants argue the goods are not related. The HUMMER vehicle is a high end sports utility vehicle which does not compete with a custom golf cart, such as Defendants' X4 golf cart. Even though the goods are related in that they all contain four wheels and are to be driven, this factor weighs in Defendants' favor, since a golf cart does not compete with a full size vehicle.

As to the similarity of the marks, GM claims the H2 mark is similar to Defendants' X4 mark. A review of the photographs of the logos submitted by GM, reveals that both letters, the H and the X are larger than the numbers 4 and 6. The numbers and letters in both are placed next to each other. Because the letters and numbers are not the same, there is a question of fact whether the marks are similar. As argued by Defendants, auto manufacturers use various combinations of numbers and letters to identify their products. This factor weighs in Defendants' favor.

GM has not submitted any evidence of actual customer confusion, other than a letter from an editor of ITEM Magazine requesting images of Defendants' Hummer X4 or X6 golfcart. However, as recognized by GM in its reply, the letter demonstrates "actual confusion from an editor writing for a golf magazine," but not a "customer" of either GM or Defendants. This factor weighs in Defendants' favor.

The only marketing channel GM has shown that Defendants use is their website. GM claims it has spent millions of dollars in advertising its vehicles with their distinctive marks and trade dress, and, for purposes of the motion for preliminary injunction, the Court assumes GM also uses a website to market its vehicles. A review of the websites submitted by GM in its papers show that Defendants are advertising the vehicles as "golf carts" which focuses on consumers who play golf or consumers who may use golf carts around their real property. However, based on GM's

7

assertions that it spends millions in advertising its products and its marks, it is assumed that the website is not the only marketing channel used by GM.  There is no evidence presented by GM that Defendants use other marketing channels which GM also uses.  This factor weighs in Defendants' favor.

As to the factor, degree of purchaser care, neither party addressed this issue.

GM has shown that Defendants had the intent to select a "look alike" of Defendants' vehicles by claiming that Defendants inquired of GM whether they could manufacture, advertise and sell golf carts that looked like GM's vehicles, in particular the HUMMER vehicles.  GM claims that in connection with the execution of the prior Permanent Injunction entered into by the parties, Defendants Miller, Berry and Couch inquired whether they could manufacture and sell the golf carts depicted on page 14 of GM's brief.  GM claims it informed Defendants that the manufacture of the vehicles would be in violation of the Permanent Injunction and breach of the Settlement Agreement that Defendant  Ultra entered into with GM.  (See Dec. 4, 2002 correspondence from GM to Defendants, Ex. J, Verified Complaint) If GM can prevail on the issue that its "marks" were infringed, then GM has shown "intent" on Defendants' part.  This factor weighs in GM's favor.

Neither party addressed the expansion of the mark factor.

Reviewing the factors set forth above and the evidence submitted the parties, GM has not carried its burden for purposes of a preliminary injunction motion that Defendants' marks cause a likelihood of confusion under the Lanham Act as to GM's marks.

### c.     Trade Dress

Based on its reply brief, GM appears to argue that Defendants have violated its trade dress with regards to GM's HUMMER and ESCALADE vehicles.  GM did not address in its briefs the

8

factors used to show trade dress infringement.

It is well established that trade dress can be protected under federal law. *Traffix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23, 28 (2001). The design or packaging of a product may acquire a distinctiveness which serves to identify the product with its manufacturer or source. *Id.* A design or package which acquires this secondary meaning, assuming other requisites are met, is a trade dress which may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods. *Id.* Courts have allowed claims of trade dress infringement under the general provision of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A). *Id.* at 28-29. Congress confirmed this statutory protection for trade dress when it amended the Lanham Act to recognize the concept in 15 U.S.C. § 1125(a)(3). *Id.* at 29. To recover for trade-dress infringement under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), a party must first identify what particular elements or attributes comprise the protectable trade dress. *See Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.,* 280 F.3d 619, 634 (6th Cir.2002) ("[I]t will not do to solely identify in litigation a combination as 'the trade dress.' Rather, the discrete elements which make up that combination should be separated out and identified in a list.")(internal quotation marks and citation omitted). Then, a party must show the following: that its trade dress has obtained "secondary meaning" in the marketplace; 2) that the trade dress of the two competing products is confusingly similar; and 3) that the appropriate features of the trade dress are primarily nonfunctional. *See Esercizio v. Roberts,* 944 F.2d 1235, 1238 (6th Cir. 1991); *Marketing Displays, Inc. v. Traffix Devices, Inc.,* 200 F.3d 929, 936 (6th Cir. 1999)(rev'd on its finding on the nonfunctional issue by *Traffix Devices,* 532 U.S. at 34-35; affirming the district court's judgment granting summary judgment finding no infringement of trade dress, *see,* 2001 WL 630049 (6th Cir. May 31, 2001)).

To show "secondary meaning," seven factors are applied: 1) direct consumer testimony; 2) consumer surveys; 3) exclusivity, length, and manner of use; 4) amount and manner of advertising; 5) amount of sales and number of customers; 6) established place in the market; and, 7) proof of intentional copying. *Marketing Displays,* 200 F.3d at 937, *citing, Sassafras Enters., Inc. v. Roshco, Inc.,* 915 F.Supp. 1, 7 (N.D. Ill. 1996). The *Frisch's* factors are used to analyze whether the trade dress of the competing products is confusingly similar. *Marketing Displays,* 200 F.3d at 937. As to whether a trade dress is functional, if a trade dress is essential to the use or purpose of the article or if it affects the cost or quality of the article, then that trade dress feature is functional and is not allowed trade dress protection. *Traffix Devices,* 532 U.S. at 33. The person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional. *Id.* at 28 (citing 15 U.S.C. § 1125(a)(3)).

The Court below makes the following findings based on the Verified Complaint and the evidence submitted by the parties for purposes of the motion for preliminary injunction only.

No direct consumer testimony or consumer surveys were submitted by GM. These factors weigh in Defendants' favor.

GM has alleged in its Verified Complaint that it has the exclusive rights to the trade dress of its HUMMER and ESCALADE vehicles. Since at least 1999, GM has used the trade dress of the HUMMER and the ESCALADE vehicles in its design and manufacture of the vehicles. This factor weighs in GM's favor.

GM has claimed that it and its predecessors have spent hundreds of millions of dollars in advertising, promoting and developing the GM marks throughout the world. Although GM has not shown the specific manner of advertising it uses on the GM products at issue, this factor weighs in

GM's favor since Defendants do not rebut the amount GM has spent in advertising and in promoting its products.

GM has not submitted the amount of sales and number of customers to establish secondary meaning other than indicating the marks are widely known and recognized throughout the world. This factor weighs in Defendants' favor.

GM has not submitted any evidence, other than indicating it has an established place in the world, that it has an established place in the "market." Defendants have argued that their "market" is the golf cart market. This factor weighs in Defendants' favor because the "market" where Defendants compete could be the golf cart market and not the automotive market. GM has not shown that it is established in the golf cart market.

As to proof of intentional copying, GM has shown, for the reasons set forth previously, that Defendants may have intended to copy GM's trade dress based on the correspondence submitted by GM dated December 2, 2002.

Weighing the factors required to show secondary meaning, GM has not submitted sufficient meaningful evidence to support its Motion for Preliminary Injunction to establish that its trade dress in either the HUMMER or ESCALADE vehicles have established secondary meaning.

As to whether GM has shown that the trade dress of both parties are confusingly similar, based on the *Frisch's* analysis used above in the trademark infringement analysis, GM has not carried its burden that the trade dress of both parties are confusingly similar.

Neither party addressed whether the trade dress at issue is nonfunctional. GM has not carried its burden that the trade dress at issue is nonfunctional.

Weighing the three factors required to establish trade dress infringement, GM has not shown

11

that it is entitled to a preliminary injunction. GM has not carried its burden that it is likely to succeed on the merits for purposes of a preliminary injunction motion.

### 3.     Irreparable Harm to Plaintiff

Irreparable harm is generally presumed upon a showing of likelihood of confusion in trademark cases. *Express Mortgage Brokers Inc. v. Simpson Mortgage, Inc.,* 31 U.S.P.Q.2d 1371 (E.D. Mich. 1994). Generally, an injunction may not issue if there is an adequate remedy at law. *Gilley v. Untied States*, 649 F.2d 449, 454 (6th Cir. 1981). Loss of good will, client trust, confidence and confidentially and competitive advantage constitutes irreparable harm for which no adequate law exists. *Basiccomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992).

Since GM has not shown a likelihood of confusion under the Lanham Act, irreparable harm cannot be presumed in this case. Although there may be no adequate remedy at law in this case since loss of good will, client trust, confidence and confidentiality are at issue, GM has not shown, other than the one letter from an editor of a golf magazine, that GM has suffered loss of good will, client trust, or confidence because of the manufacture and sale of the golf carts by Defendants. Because GM has not carried its burden to show likelihood of confusion based on its trademark or trade dress, GM has also not shown that it has suffered the loss of good will or confidence of its customers.

### 4.     Harm to Others/Public Interest

Once likelihood of confusion is shown in Lanham Act cases, the public interest is damaged if such confusion continues. *Gougeon Bros., Inc. v. Hendricks,* 708 F.Supp. 811, 818, 8 U.S.P.Q.2d 1926 (E.D. Mich. 1988). Because GM has not shown likelihood of confusion at this juncture, there is no showing that public interest has been damaged. Defendant Hot Carts claims that if a

preliminary injunction is issued, it will essentially put Defendant Hot Carts out of business. The balance of the hardships in this case weighs in Defendants' favor.

### 5. Weighing the Factors

Weighing the factors set forth above, the Court finds that GM has not shown that it may succeed on the merits, that it may suffer irreparable harm nor harm to others and the public. Preliminary injunction will not issue in this case.

### III. CONCLUSION

For the reasons set forth above,

IT IS ORDERED that Plaintiff's Motion for Preliminary Injunction **(Docket No. 4, filed August 3, 2004)** is DENIED.


 /s/ DENISE PAGE HOOD
DENISE PAGE HOOD
DATED: May 13, 2005                                    United States District Judge